UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:11-CV-00116-R

GAYLON HAYDEN                                                    PLAINTIFF

v.

MARTIN MARIETTA MATERIALS, INC.
FLEXIBLE BENEFITS PROGRAM                                        DEFENDANT

## MEMORANDUM OPINION

Before the Court is Plaintiff's brief for judgement on the administrative record (DN 13).

Defendant has responded (DN 18) Plaintiff has replied (DN 19), Defendant has submitted a sur-

reply (DN 20), and Plaintiff has replied to the sur-reply (DN 22).  This matter is now ripe for

adjudication.  For the reasons that follow, judgment is entered for Plaintiff.  This matter is

remanded to the administrator for a full and fair review.

## I. BACKGROUND

Plaintiff Gaylon Hayden ("Hayden") brings this action against Defendant Martin

Marietta Materials, Inc. Flexible Benefits Program ("the Plan") under the Employee Retirement

Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").[1]  Hayden, by virtue of her

employment at Martin Marietta, was covered under a group long-term disability ("LTD") plan,

insured and administered by Liberty Life Assurance Company of Boston ("Liberty").  She

alleges that a variety of health issues prevented her from performing her essential duties at

---

[1] Hayden originally filed suit against the Plan in McCracken County Circuit Court. Though she does not cite to the provisions of ERISA, the parties do not dispute the Plan is governed by the statutory regime.  After review, the Court finds it has original jurisdiction under ERISA.  *See* 29 U.S.C. § 1132(a)(1)(B).

Martin Marietta, causing her to apply for LTD benefits on January 5, 2010.  After navigating the administrative process, the Plan denied Hayden's application because she did not satisfy the standard for "own occupation" disability under the Plan.  She now brings suit to recover past and future benefits.

### A. Relevant Plan Provisions

The Plan promises regular payments to Martin Marietta employees for "disabilities" when resulting from injury or sickness.  Administrative Record ("AR"), p. 16.  As with many disability insurance agreements, the Plan provides a two-tiered definition of "disability" and "disabled":

> "Disability" or "Disabled" means:
>
> 1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:
>
>> (I) if the Covered Person is eligible for the 24 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and
>> (ii) thereafter, the Covered person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

AR p. 7.  The Plan defined "Own Occupation" as follows:

> "Own Occupation" means the Covered Persons's occupation that he was performing when his Disability or Partial Disability began.  For the purposes of determining Disability under this policy, Liberty will consider the Covered Persons's occupation as it is normally performed in the national economy.

AR p. 9.  The Plan's terms provide disabled employees 60% of their salary, along with cost of living increases until age 65.

The Plan's "Elimination Period" governs the time period for petitioning Liberty for LTD benefits and is defined as follows:

"Elimination Period" means a period of consecutive days of Disability of Partial Disability for which no benefit is payable.  The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.

AR p. 7.  The Elimination Period lasts for the greater of 180 days or the end of the employee's short term disability benefits.  AR p. 4.

The Plan covers disability caused by "Mental Illness" as well.  A Mental Illness means:

[A] psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of Mental Illness. If the DSM is discontinued, Liberty will use the replacement chosen or published by the American Psychiatric Association.

AR p. 9.  Employees disabled by mental illness may recover "a combined period of 24 months of Monthly Benefit payments while the Covered Person is insured."  AR p. 18.

**B. Hayden's Position and Physical Condition**

Hayden is a fifty-five-year-old woman.  She was employed as an office manager at Martin Marietta from 1997 until January 4, 2010.  AR p. 49, 61.  Her essential functions required her to communicate with other employees, develop correspondences, maintain files, and prepare and distribute mail.  AR p. 711.  She worked eight hours a day, five to six days a week.  AR p. 711.  The physical demands of her position were moderate but required that she bend, squat, twist, walk, grip, grasp, stand, sit, overhead reach, and full arm reach.  AR p. 711-12.

Hayden's medical history is complicated and best understood if bifurcated between her physical and mental ailments.  For her physical problems, the medical records submitted with her claim predate her application for LTD benefits by seven years.  Hayden's physicians, at one time or another, diagnosed or suspected that she suffered from numerous ailments:

- Chronic hepatitis C since the mid-1990s.  AR p. 221, 234, 259.
- Fibrocystic breast disease with breast implants.  AR p. 168, 221

3

- Breast cancer in 2007 followed by a lumpectomy.  AR p. 364
- Hypothyroidism.  AR p. 164, 234, 259.
- Osteoarthritis.  AR p. 234.
- Insomnia.  AR p. 234.
- Hypertension.  AR p. 234.
- Rheumatoid or degenerative arthritis.  AR p. 164, 234, 259.
- Breast carcinoma.  AR p. 164, 259.
- Hypotension.  AR p. 164.
- Carpal tunnel.  AR p. 168.

Dr. Bassi, her treating physician, made the majority of these diagnoses and as early as 2010 he suggested that she apply for disability.  AR p. 190, 221.  The proclamation was seemingly based on Dr. Bassi's subjective impression of her condition rather than objective medical testing.

The day after she made her request for LTD benefits, Hayden had a long visit with Dr. Bassi.  There, he listed eleven different diagnoses and opined that she was "completely and totally disabled from gainful employment."  AR p. 190.  In February of 2010, Dr. Bassi transcribed another long list of Hayden's medical problems.  AR p. 191-93.  Though new disorders emerged during this visit, Dr. Bassi also indicated that several of Hayden's physical ailments had resolved themselves or were under control.  AR p. 193.

Subsequent visits to Dr. Bassi from March to October of 2010 generated more conditions.  AR p. 194-97.  Of most concern to Dr. Bassi was the presentation of a disorder mimicking the symptoms of syncope.  AR p.  194-97.  Dr. Bassi provided the following background on this diagnosis during an appointment on September 9, 2010:

> [Hayden] has episodes of syncope, presyncope.  The patient notes that she has had 2-3 episodes over the past year where she is sitting and has the onset of pain and discomfort about her upper cervical spine.  The patient notes symptoms happen quickly.  She was [at] Walmart the other day and fell into the deli counter.  The patient notes nothing else has modified it.  She has not associated signs or symptoms.  This is quite difficult to assess.  Her recent MRI did show a couple of ischemic focuses.  Her MRI also shows some cervical spine arthritis.  I am really not sure what is going on.  This does not really sound like a seizure.  Symptoms are momentary.

4

We will check a tilt table and review her management.

AR p. 196.  A month later, he made more observations on Hayden's syncope:

> Syncope. . . . I again review[ed] her situation with regard to her syncope.  She has
> had several episodes this past year, one a few weeks ago.  It occurs after a
> phlebotomy episode, but also sometimes prior to the episode.  She notes [] when she
> turns and bends her head backward she has a syncopal episode.  She has actually lost
> consciousness.  The patient and I reviewed her situation.  She is now found to have
> a patent foramen ovale.  She needs an evaluation.  She will have reassessment.  The
> patient has thickened aortic valve, but without stenosis.

AR p. 197.  Hayden entered the hospital on November 11, 2010, with an admitting diagnosis of

presyncopy.  AR p. 198.  A tilt table test performed on Hayden showed some signs of

orthostasis, but her physicians disagreed as to the cause and severity of her syncope.  AR p. 201,

209.  After seven days, she was released from the hospital, given an assortment of medications,

and restricted from driving.  AR p. 209.  Dr. Bassi continued to document the ailment, which

involved a lengthy explanation during a deposition in January of 2011 when Hayden applied for

Social Security disability benefits.  AR p. 212-13; 491-515.

While Dr. Bassi generated the vast majority of the medical reports and opinions in the

Administrative Record, other physicians treated Hayden's physical infirmaries as well.  Dr. Kest

regularly saw Hayden from June 2008 until the end of 2010.  AR p. 287-329.  In December of

2009, he made a notation on her medical record that Hayden's left vocal cord showed signs of

paralysis but believed the opposite cord was adequately compensating for the problem.  AR p.

306.  Almost a year later, Dr. Kest found an edema of the laryngeal structures on the posterior

larynx, affecting Hayden's comfort when speaking.  AR p. 292.  He recommended that Hayden

"avoid harsh vocal use, yelling or throat clearing."  AR p. 292, 289.

Other physicians recognized symptoms consistent with syncope as well.  Hayden

5

reported an incident of fainting and feeling light-headed.  AR p. 411, 432-33.  Dr. Carter, a

neurologist, sent Hayden to Vanderbilt University Medical Center in January of 2011.  AR p.

273.  There, a study showed abnormal results regarding whether she suffered from syncope.  AR

p. 273.  Neither Hayden nor Dr. Carter followed up on the study's results.

      With respect to Hayden's mental health, she received sporadic treatment between 2007

and 2010.  Psychiatrist Dr. Kelley saw Hayden from December 2006 to February 2007, during

which he found her depressed, anxious, and tense, with feeling of self-reproach, hopelessness

and worthlessness.  AR. 373.  He diagnosed her with general anxiety disorder, major depression,

and recurrent insomnia.  AR p. 379.  Another mental health professional, Dr. Lyons, examined

Hayden in February of 2010.  He declined to issue a diagnosis but documented some of the

mental health issues affecting Hayden, such as dysphoria, anhedonia, malaise, and fear-based

anxiety.  Hayden did not pursue treatment again until September of 2010 when she visited Dr.

Meyer, another psychiatrist.  Dr. Meyer diagnosed her with major depression as well.  AR p.

104-05.  A counseling service that Hayden sought treatment in October of 2010 found her

depressed and anxious.  AR p. 274.

      For her claim for Social Security Disability benefits, Hayden was examined by Dr.

Thomas Muehleman on March 25, 2010.  AR p. 131-36.  In his report, Dr. Muehleman wrote

about her previous mental health treatment.  He concluded that Hayden was "markedly

impaired" from sustaining attention to simple, repetitive tasks, relating to others at work, and

tolerating the stress and pressure associated with day-to-day work activities.  AR p. 135.

### C. Claim for LTD Benefits

      Hayden stopped working as the office manager at Martin Marietta on January 4, 2010.

She submitted her claim for LTD benefits the next day.  The Plan obtained many of her medical records and initiated its review shortly thereafter.  For her claim, the Elimination Period ran the full 180 days, from January 4, 2010 until July 4, 2010.

An initial file review was performed by the Plan on July 22, 2010.  Dr. Bassi was contacted and questioned on his pronouncement of disability.  He responded that Hayden was disabled as a result of her Hepatitis C, fatigue from breast cancer, neck pain and arthritis, vocal cord dysfunction, herniated discs, and heart valve problems.  AR p. 54.  The Plan's representative performing the initial file review noted that Dr. Bassi could not pinpoint any one of the conditions as the impetus for her disability.  Rather, Dr. Bassi blamed her comorbidities.  AR p. 54.  The representative deduced that Hayden's underlying medical problems were not impairing and referred the claim to peer-to-peer contact with Hayden's physicians.  AR p. 54.

More medical evidence was reviewed by the Plan while the peer-to-peer contact was scheduled.  Much of it was unfavorable to Hayden's claim.  Staff from Dr. Kest's office contacted the Plan and indicated that no restrictions had been placed on Hayden as a result of her vocal cord condition.  AR p. 57.  Hayden's oncologist relayed that she was doing well since her lumpectomy in 2007, was in remission, and being monitored every six months.  AR p. 364-66.  The University of Kentucky Cancer Center corroborated her oncologist's assessment.  AR p. 52.

The Plan referred Hayden's matter to Dr. David M. Peterson for a clinical case review.  AR p. 561-65.  Dr. Peterson examined her medical records and contacted Dr. Bassi to discuss her health.  Dr. Peterson concluded Hayden was not impaired from working at her usual occupation and did not support any restrictions or limitations.  AR p. 542, 553, 562-63.  The other ailments were either improved or did not inhibit Hayden from working prior to January of 2010.  AR p.

7

562.  He suggested that her file be referred to a board-certified psychiatrist to determine whether her psychiatric diagnoses were physically impairing.  AR p. 563.

The Plan then transmitted Hayden's file to Dr. Raymond J. Chagnon, an internist, and Dr. Gil Lichtshein, a psychiatrist, for an independent panel review.  AR p. 538-557.  Dr. Chargnon examined Hayden medical record and spoke with Dr. Bassi about her condition, after which he wrote that her multiple medical problems were not causing impairments that restricted her from performing her own occupation.  AR p. 544-45.

Dr. Lichtshein reviewed Hayden's mental health records but lacked those created during her psychological treatment prior to 2010.  AR p. 548-49.  Dr. Lichtshein also spoke with Dr. Bassi about her mental state.  AR p. 555.  During the discussion, Dr. Bassi recounted Hayden's long history of depression and clarified that this condition was the stimulus for her disability.  AR p. 555.  Nevertheless, Dr. Lichtshein judged that no psychiatric or non-psychiatric foundation existed for her impairment and no objective data suggested Hayden was afflicted with "debilitating depression or anxiety."  AR p. 556.

The Plan denied Hayden's claim for LTD Benefits by letter in reliance on the opinions of Drs. Chagnon and Lichtshein.  AR p. 532-35.  Hayden appealed the decision on February 17, 2011, whereupon she submitted more medical records.  AR p. 517-18.  The Plan forwarded the updated file to an appeal-review unit comprised of medical and psychiatric specialists.

Dr. Gregg Marella, an internist, performed the medical review for Hayden's appeal.  AR p. 86-90.  The Plan requested that Dr. Marella review the medical records, speak with Dr. Bassi, and determine what medical diagnoses were supported by the medical evidence.  AR p. 86-90.  He found support for the diagnoses of breast cancer, hypothyroidism, osteopenia, hepatitis C,

8

hemochromatosis, degenerative joint disease, syncope, gastritis, and anxiety.  AR p. 88.  Further, he credited Hayden's syncopal episodes and determined she was impaired by this condition as of November 23, 2010.  AR p. 89.  To effectively control her syncope, Dr. Marella recommended that Hayden not operate heavy machinery or climb ladders.  Still, he believed that the etiology of Hayden's syncope remained unclear since there were no medical tests to aid the diagnosis.  AR p. 88.  Besides the syncope, Dr. Marella discovered a disconnect between what Dr. Bassi thought Hayden's capabilities were and what the medical documents insinuated.  AR p. 89.  Dr. Marella refused to believe that her medical conditions were fully documented or explained why she was incapable of working.  Even if she was restricted to light duty as a result of her syncope after November 23, 2010, Dr. Marella disagreed that she could not work in a full-time sedentary or light-duty position if proper precautions were taken.  AR p. 89.

Dr. Enrique Olivares, a psychiatrist, performed the panel review from the mental health perspective.  AR p. 75-79.  The Plan posed the following questions: what diagnosis was supported by the medical evidence, what inconsistencies were there between the treating providers and the evaluators, and was Hayden impaired from January 1, 2010, to July 4, 2010?  AR p. 75-79.  Dr. Olivares spoke with Dr. Meyer and reviewed the medical evidence submitted with the appeal.  AR p. 75.  Documents generated during Hayden's visits to Dr. Kelley, Dr. Lyons, and the counseling service were not provided.

Dr. Olivares did not find that Hayden suffered from psychiatric problems that prevented her from working.  He recognized that she was diagnosed by Dr. Meyer with major depressive disorder and prescribed medication in October of 2010.  AR p. 76.  He also noted that Dr. Bassi diagnosed her with anxiety and depressive disorders in July of 2010.  AR p. 76-77.  He thought

9

these disorders were supported but could not determine their causes.  AR p. 77.

Regardless, Dr. Olivares reasoned that no evidence was present to show Hayden's mental impairments or cognitive shortcomings imperiled her ability to work from January 5, 2010 to July 4, 2010, or thereafter.  AR p. 77.  He believed her past psychiatric care and her current treatment regime were substandard, and though Hayden claimed she was intolerant to antidepressants, Dr. Olivares observed that she had not taken the appropriate medication or combination of medications in the past.  AR p. 77-78.  Ultimately, he decided the medical evidence was inadequate to show her disabled under the Plan.

Relying on the recommendations from Drs. Marella, Olivares, Chagnon and Lichtshein, the Plan upheld its denial of LTD benefits on April 26, 2011.  AR p. 63-70.  The instant lawsuit followed.

### D. Social Security Disability Benefits

While her appeal was pending, Hayden applied for Social Security Disability ("SSD") benefits.  Dr. Bassi made a lengthy statement in support of Hayden's petition.  AR p. 491-515. On February 21, 2011, Hayden was awarded full benefits by an administrative law judge ("ALJ").  AR p. 145.  The ALJ found that Hayden had been disabled from any occupation since January 5, 2010.  Hayden forwarded the favorable ruling to the Plan before the final denial.

In the rejection letter, the Plan acknowledged the SSD award but declined to change its position.  AR p. 69.  The Plan explained that the Social Security Administration used its own, unique set of criteria and stated that the "totality of the medical information contained on file [shows] that her conditions do not remain of a degree and severity to preclude her from performing the material and substantial duties of her own occupation."  AR p. 69.

10

## II. STANDARD

Generally, courts "review a plan administrator's denial of ERISA benefits de novo." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  However, when "a plan vests the administrator with complete discretion in making eligibility determinations, such determinations will stand unless they are arbitrary or capricious."  *Id.*  "The arbitrary and capricious standard is the least demanding form of judicial review and is met when it is possible to 'offer a reasoned explanation, based on the evidence, for a particular outcome.'"  *Admin. Comm. of the Sea Ray Employees' Stock Ownership & Profit Sharing Plan v. Robinson*, 164 F.3d 981, 989 (6th Cir. 1999) (citation omitted).  "Consequently, a decision will be upheld 'if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.'"[2]  *Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (citations omitted).

Still, while the arbitrary-and-capricious standard is deferential, it is not "'without some teeth.'"  *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (citation omitted).  A court's obligation to review the administrative record "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues."  *Id.*  Without such a review "courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence - no matter how obscure or untrustworthy - to support a denial of a claim for ERISA benefits."  *Id.*

The standard of review may be affected by inherent conflict of interests, such as when a

---

[2] Neither party disputes Liberty is vested with complete discretion to determine who qualifies for benefits.  Accordingly, the Court will apply the arbitrary-and-capricious standard.

plan administrator both determines and pays for benefits.  A court must consider this potential conflict of interest, but only as one factor in its analysis.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008); *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir.2007).  Such conflicts do not change the standard of review.  *Glenn*, 554 U.S. at 116-17.

### III. DISCUSSION

Hayden locates numerous shortcomings with the Plan's evaluation of her benefits claim. She contends her medical records establish that she cannot perform her "own occupation" or "any occupation," as defined under the Plan's terms.  She petitions the Court to find her disabled from "any occupation" and award benefits.  Hayden asserts that the Plan ignored pertinent medical evidence gathered during the Elimination Period.  Because she exhibited symptoms of syncope prior to her last day of work but was diagnosed after her departure, Hayden says the Court should backdate this disorder to before she left work.  Finally, she criticizes the Plan for simply conducting a file review, urges reversal in light of the favorable Social Security decision, and  requests that the Court to properly weigh the administrator's conflict of interest.

Notwithstanding Hayden's segmentation of the Plan's errors, the benefits decision is best viewed through the prism of Hayden's physical and mental health.

### A. Implications of the Administrative Record

Hayden has difficulty expressing which of her conditions prevents her from working at Martin Marietta.  Rather than focus on any one of her ailments, Hayden contends that her comorbidities have worked in concert to disable her.  Indeed, Dr. Bassi has changed or revisited her precise disabling condition on several occasions.  AR p. 86, 543, 555.  The difficulty categorizing Hayden's disability is apparent in the present briefing as well, with Hayden offering

a host of medical reasons why the Plan's decision was arbitrary and capricious.

Initially, Hayden declares the sum of her comorbidities has disabled her. She asks the Court to aggregate her infirmities and find her disabled from any occupation. After consideration, the Court is disinclined to issue its own diagnosis. Many of the maladies documented in the Administrative Record did not keep Hayden from performing her occupation. For example, while various medical reports refer to her hepatitis C, carotid vascular disease, gastritis, and breast cancer, her physicians consistently found these conditions to be under control, stable, or improving. AR p. 96, 97, 194, 195, 234, 409-10, 413. The physicians treating Hayden's cancer and vocal troubles clarified that these problems were not a reason for her disability. AR p. 52, 57, 364-66. As most of Hayden's ailments are unmoored from her disability claims, the Court will not combine them and award LTD benefits.

If the totality of her medical conditions is insufficient for a disability, Hayden avers that her specific disorders were either ignored or improperly evaluated by the Plan's medical reviewers.[3] She begins with the diagnoses of severe degenerative arthritis in her hands, carpal tunnel syndrome, and peripheral neuropathy. Dr. Bassi related that these conditions prevented her from performing any of her position's physical duties. AR p. 488-90.

The Administrative Record contains conflicting evidence on these diagnoses. Dr. Bassi's medical records never mention degenerative arthritis in Hayden's hands, instead relegating the ailment to her hips, shoulders, and knees. AR p. 103, 164, 190, 195. He also minimized the severity of the condition even after she left Martin Marietta. AR p. 103 (arthritis was "controlled

---

[3] Hayden includes her syncope in this section, maintaining that this condition by itself renders her disabled. As her syncope arose after the Elimination Period, the Court postpones its discussion of this ailment. *See infra*.

with current regimen"); AR p. 195 ("[Hayden] has modest arthritis regarding her shoulders, hips

and knees."). As for Hayden's carpal tunnel, Dr. Bassi's references the condition on at least two

separate occasions but never diagnosed her with the ailment. AR p. 168 ("[Hayden] comes in

noting she has been having left hand pain and wrist pain; questionable carpal tunnel."); AR p.

196 ("[Hayden] clinically has evidence of carpal tunnel syndrome. She will have a nerve

condition study for review."). For Hayden's neuropathy, not only were there no tests or exams

to confirm this diagnosis, but the condition disappears from Hayden's list of ongoing problems

after her appointment in January of 2010. *See* AR p. 96, 97, 103, 195, 196, 202. Moreover, Dr.

Bassi did not discuss these conditions with the Plan's medical reviewers or affirm that Hayden's

hand troubles were the reason for her disability. The Plan was justified to discount the reach of

these conditions given Dr. Bassi's mixed messages. *See Edwards v. Metropolitan Life Ins. Co.*,

737 F. Supp. 2d 743, 763 (E.D. Mich. 2010) (conflicting medical evidence allowed administrator

to deny benefits claim).

Hayden posits that the Plan ignored her vocal cord paralysis and Dr. Kest's order to

refrain from "harsh vocal use, yelling, or throat clearing." AR p. 289, 292. Hayden however has

mischaracterized the medical evidence underlying her vocal cord paralysis. She forgets Dr.

Kest's decision to contact the Plan and relay that no restrictions were ever placed on Hayden.

AR p. 57. Dr. Kest's own records, which show the condition was resolving itself, belie any

argument that her vocal paralysis prevented her from performing her own occupation. AR p.

289-92. The medical evidence does not support Hayden's contention that her vocal cord

paralysis rendered her disabled; therefore, the denial was not in error. *See Williams v. Int'l*

*Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) ("'[W]hen it is possible to offer a reasoned

14

explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or

capricious.'" (quoting *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989))).

Hayden says that she is disabled as a result of her mental condition.  She argues that the

medical records describing her depression and anxiety prove she is incapable of interacting with

people and working in her position.  Alternatively, even if the Court is unconvinced by this

assessment, Hayden proposes that medical reviewers were not provided all of her psychiatric

records.  She requests remand to the administrator since the Plan's medical reviewers reached

their conclusions without all the relevant information.

The Court finds the review of Hayden's mental health records faulty.  In conjunction with

Dr. Bassi's diagnosis of her mental health conditions, four different mental health professionals

treated Hayden.  Dr. Kelley saw Hayden on at least five occasions from December of 2006 to

February of 2007.  He believed Hayden suffered from major depression and generalized

personality disorder, and prescribed her antidepressants.  Hayden was also seen by Dr. Lyons on

February 15, 2010, who documented symptoms from mental disorders like dysphoric and fear-

based personality and self-described anhedonia.

Dr. Olivares was not provided with either Dr. Kelley's or Dr. Lyon's opinions during his

review of Hayden's medical file.  The absence of these documents influenced Dr. Olivares'

conclusions, as he incorrectly wrote in his report that Hayden was first diagnosed with major

depressive disorder in 2010.  AR p. 76.  He found Hayden had not received the psychotherapy

she needed in the past and was critical of the antidepressants and antipsychotics that her

providers prescribed.  Dr. Olivares came to these conclusions without the complete background

on Hayden's mental health.[4]

Furthermore, Dr. Olivares seemingly disregarded the report Dr. Muehleman created.  Not once does Dr. Olivares mention Dr. Muehleman's findings that Hayden exhibited problems performing simple tasks and had difficulty tolerating the stress and pressures of day-to-day work.  Dr. Olivares also failed to recognize that within Dr. Muehleman's report were explicit references to Hayden's past treatments with Drs. Kelley and Lyons.  AR p. 132, 134.  Had Dr. Olivares examined this record, he would have realized that Hayden had received psychiatric care prior to 2010 and perhaps investigated the issue further.

The Plan did not abide by its obligation to conduct a full and fair review of Hayden's condition.  Just as a plan administrator may not "arbitrarily disregard the medical evidence proffered by the claimant," *Roumeliote v. Long Term Disability Plan For Employees of Worthington Indus.*, 475 F. Supp. 2d 742, 747 (S.D. Ohio 2007) (citation omitted), it must also provide physicians performing a file review with all letters and records from a claimant's physician.  *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 393 (6th Cir. 2009).  Dr. Olivares was not given the majority of Hayden's mental health records and then asked to comment on the current state of her mental health.  Under these circumstances, the Plan's assurances that it performed a full and fair review ring hollow.  *See Lederman v. Reliance Standard Life Ins. Co.*, No. 06-CV-00825, 2009 WL 3161835, at*7-8 (D. Colo. Sept. 30, 2009) (overturning denial of benefits and remanding for full and fair review where a plan administrator

---

[4] Hayden argues that other documents created by mental health providers were not received and reviewed by Dr. Olivares.  Plaintiff Reply, DN 19 p. 2.  These included records from visits to Jill Flynn and Dr. Kelley in February and March of 2011.  Since these treatment sessions arose after the end of the Elimination Period, they do little to aid her argument that she is disabled under the Plan.  *See infra.*

did not submit entire medical file to physician performing file review).

Although the Plan's review of Hayden's physical condition satisfies the applicable standard of review, the same cannot be said for her mental health. The Court will weigh this inadequacy in favor of overturning the decision.

### B. Elimination Period

Hayden protests the treatment of the Elimination Period as it pertains to the emergence of several of her ailments, in particular, her syncope. In his evaluation of her medical records, Dr. Marella said Hayden's syncope merited some work restrictions, but only after November 23, 2010. Since the last date of the Elimination Period was July 4, 2010, the Plan reasoned that this condition was inadequate to award LTD benefits. Hayden argues that the Plan's file examiners ignored medical evidence preceding her last day of work that accentuated this diagnosis.

The Plan unambiguously demarcates the date from which an employee's disability is measured. AR p. 4, 7, 16. It signaled in its correspondences with Hayden that the 180-day Elimination Period ended on July 4, 2010. AR p. 64. Because an administrator does not act in an arbitrary and capricious manner when it abides by the policy's restrictions, courts consistently heed administrators' denials when claimants have failed to establish they are entitled to benefits during the elimination period. *See*, *e.g.*, *Butts v. Continental Cas. Co.*, 357 F.3d 835, 839 (8th Cir. 2004) (administrator's denial of benefits upheld where "[t]here [was] no evidence that the administrators' interpretation of the plan's elimination period was internally inconsistent or contrary to plan language"); *Kennedy v. Aetna Life Ins. Co.*, No. 4:10-CV-1436-FRB, 2012 WL 1858960, at *19 (E.D. Mo. May 22, 2012) ("The decision to deny plaintiff long term disability benefits on account of his inability to meet the Plan's required elimination period was

17

reasonable."); *Edwards v. Metropolitan Life Ins. Co.*, 737 F. Supp. 2d 743, 762 (E.D. Mich. 2010) (where plaintiff did not show continuing disability through the elimination period, denial of benefits was not arbitrary and capricious); *Disanto v. Wells Fargo & Co.*, No. 8:05-CV-1031, 2007 WL 2460732, at *12 (M.D. Fla. Aug. 24, 2007) (when claimant did not provided medical evidence of disability within the elimination period, denial of benefits was justified).

The majority of the medical evidence for Hayden's syncope surfaced after her last day of work.  Dr. Bassi first observed the presence of syndrome on September 9, 2010, and characterized it as "syncope or pre-syncope."  AR p. 196.  He was candid that he was unsure what "was going on" and said additional testing was necessary to evaluate these complaints.  AR p. 196.  Though Dr. Bassi's reports examine the progression of her syncope, they are untethered from the time period relevant to establishing her disability.  AR p. 96, 97, 197.

Hayden emphasizes that other physicians saw syncope-like symptoms during medical visits prior to her last day of work.  Dr. Kest noted that Hayden complained of vertigo in September of 2008.  AR p. 308.  In July of 2009, Hayden reported being lightheaded and dizzy after a phlebotomy.  AR p. 411.  Though these incidents may display some of syncope's calling cards, neither was so grave as to justify further examination, much less a finding that Hayden could not continue to work.  They do not persuade the Court that the Plan's decision was wrong.

Overall, the Plan did not act in an arbitrary and capricious manner by discounting this medical evidence created after the Elimination Period.

### C. File Review

Hayden complains the Plan should have expanded its investigation to include a physical examination and not relied on a file review.  A file review of a benefits decision is not inherently

objectionable if performed by a qualified medical professional. *Calvert v. Firstar Fin., Inc.*, 409

F.3d 286, 296 (6th Cir. 2005). Where the administrator foregoes a physical examination,

questions can exist about the accuracy of the benefits decision. *Bell v. Ameritech Sickness &*

*Acc. Disability Ben. Plan*, 399 F. App'x 991, 1000 (6th Cir. 2010) (citing *Helfman v. GE Group*

*Life Assurance Co.*, 573 F.3d 383, 393 (6th Cir. 2009)). Benefits determinations may be

arbitrary and capricious when they make credibility determinations without the aid of a physical

exam. *Id*.

With regard to Hayden's physical condition, the Plan's medical reviewers did not shut

their eyes to the treating physicians' diagnoses or make credibility determinations about her

symptoms. Instead, the objective medical evidence was insufficient to prove a disability. Three

different internists reviewed Hayden's medical records and deduced that her conditions would

not frustrate her performance as office manager. Their opinions sprout from the dearth of

medical evidence supporting her physical diagnoses and her failure to show that she was

disabled during the relevant time period. The benefits decision was not meaningfully impacted

by the Plan's choice to conduct a file review.

The same cannot be said for Hayden's mental health. Though submitted to the Plan

during the administrative process, neither of the psychiatrists who performed the file review

considered her pre-2010 mental health records. It violates the Department of Labor's regulations

when a plan administrator declines to appraise "all comments, documents, records, and other

information submitted by the claimant . . . without regard to whether such information was

submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503–1(h)(iv).

That the psychiatrists performing the file review did not possess all the relevant evidence weighs

heavily in favor of overturning the decision as arbitrary and capricious.  *See Shelby v. Lubrizol Corp. Wage Employees' Pension Plan*, No. 5:09–CV–58, 2009 WL 4730203, at *5 (W.D. Ky. Dec. 4, 2009) (file review weighed against the plan administrator when doctor performing review did not consider all available medical evidence).

### D. Social Security Decision

As the Plan requires participants to apply for SSD benefits to offset any future LTD payments, Hayden contends the Plan did not properly assess the agency's benefits decision.  The Plan counters that it is not bound by the ruling because the physicians evaluating Hayden's records performed a thorough review that discredited her treating physician's opinions.

Though a favorable SSD benefits decision is not controlling on an administrator's benefits determination, it "is far from meaningless."  *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294 (6th Cir. 2005).  At a minimum, it provides support for the medical evidence in the administrative record.  *Id.*  It should also "garner more attention when the plan administrator requires and actively requests the claimant to apply for such Social Security benefits."  *Delisle v. Sun Life Assur. Co. of Canada*, 636 F. Supp. 2d 561, 569 (E.D. Mich. 2007).  If an administrator encourages plan participants to apply for disability with the Social Security Administration, incurs a benefit from an award, and then declines to explain why the agency's determination did not impact the plan's benefits decision, "the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious."  *Bennett v. Kemper Nat. Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008) (citing *Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006)).

The Plan provided a sufficient explanation as to why the award of SSD benefits did not influence its analysis.  AR p. 69.  It stated in its rejection of Hayden's appeal that it had given

due credit to the agency's decision but found that the implications of her file showed she was not disabled under the terms of the Plan.  AR p. 69.  The Plan's rationale satisfies the Sixth Circuit's pronouncement that administrators "discuss" the foundation for a different determination than the Social Security Administration.  *Bennett*, 514 F.3d at 553 n. 2.

Additionally, the weight the agency places on a treating physician's opinion is an important distinction between the two disability rulings.  A significant portion of the Administrative Record supporting Hayden's disability diagnosis comes from Dr. Bassi, her treating physician.  While the Social Security Administration was required to defer to his opinion about her health, the Plan was under no such obligation.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003).  The Plan's emphasis on the unfavorable medical opinions from Hayden's non-treating physicians was not an arbitrary and capricious exercise of its power.  *Roumeliote v. Long Term Disability Plan for Employees of Worthington Indus.*, 475 F. Supp. 2d 742, 746 (S.D. Ohio 2007) ("As long as a plan administrator offers a reasonable explanation based upon the evidence for its decision, it may choose to rely upon the medical opinion of one doctor over that of another doctor.").

### E. Conflict of Interest

Hayden offers that the Plan's inherent conflict of interest should tilt the scales in her favor.  As neither party disputes that Liberty both determines and pays benefits, a potential conflict exists.  *Cooper*, 486 F.3d at 165.  Though one of many factors in the Court's review, a conflict should not be a substantial factor if the insurer has taken steps to reduce bias, such as "walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking." *Glenn*, 554 U.S. at 116-17.  The

First Circuit has interpreted these statements to mean "courts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts." *Denmark v. Liberty Life Assurance Co. of Boston*, 566 F.3d 1, 9 (1st Cir. 2009).

No evidence has been introduced by either party about the administrator's inherent conflict of interest. Hayden does not provide a history of bias in the decision-making process by the Plan or its medical reviewers. The Plan does not introduce any proof on its steps to reduce bias during the review process. In the absence of such information, this Court gives only slight weight to an administrator's conflict of interest. *See Swiger v. Continental Casualty Co.*, No. 05–255–ART, 2008 WL 1968346 (E.D. Ky. May 2, 2008) (where plaintiff offered no evidence that the conflict of interest affected the decision to deny benefits, the court accorded little to no weight to the conflict of interest).

### F. Weighing the Evidence and Appropriate Disposition

The Plan's review of Hayden claim is better addressed if divided into her physical health and mental health. The Court finds that denying Hayden's claim with respect to her physical health was not arbitrary and capricious. The conditions cited by her physicians are not supported by objective medical evidence and not sufficiently severe to preclude her from performing her own occupation. The physicians who reviewed her medical file based their opinions on obvious discrepancies rather than any impermissible factors. This portion of the benefits decision followed from a "deliberate principled reasoning process . . . supported by substantial evidence." *Evans*, 434 F.3d at 876. It will not be disturbed.

The Court reaches a different decision for Hayden's mental health. Neither party

22

disputes that in reaching his opinions, Dr. Olivares did not review a substantial portion of Hayden's mental health records.  The omission of the documents resulted in inaccurate conclusions regarding when Hayden was first diagnosed with major depression and the extent of her past treatment.  Dr. Olivares' report also leaves the Court with the unmistakable impression that he did not closely scrutinize Dr. Muehleman's findings.  These missteps are too great to uphold the Plan's decision under the arbitrary-and-capricious standard.  *See Shelby*, 2009 WL 4730203, at *5; *Lederman*, 2009 WL 3161835, at *7.  Nevertheless, the Court does not believe the record clearly establishes that Hayden is entitled to benefits.  Therefore, this case is remanded to Liberty to conduct a full and fair review.  *See*, *e.g.*, *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006) (remand appropriate where the Court did not find that the plaintiff was "clearly entitled to benefits").

## CONCLUSION

For the foregoing reasons, judgment is entered for Plaintiff.  This matter is hereby REMANDED to the Administrator for a full and fair review consistent with this opinion.  On remand, the Court directs Liberty to review Hayden's psychiatric records created before her final day of work on January 5, 2010, along with those that directly bear upon her mental health during the Elimination Period.

An appropriate order shall issue.